UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

THOMAS EDWARD BURKE, JR.                                        PLAINTIFF

v.                                        CIVIL ACTION NO. 3:23-CV-P219-JHM

LUTHER LUCKETT CORRECTIONAL
COMPLEX *et al.*                                                DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by Defendant Elaine Smith.  (DN 94).  Proceeding *pro se*, Plaintiff Thomas Edward Burke, Jr., filed a response to the motion (DN 97), and Defendant Smith filed a reply.  (DN 99).  Thereafter, Plaintiff filed another response which the Court will construe as a sur-reply.  (DN 103).  For the reasons that follow, the motion for summary judgment will be granted.

## I.

Plaintiff is an inmate at the Luther Luckett Correctional Complex ("LLCC").  Upon initial review of the superseding amended complaint (DN 15) and second amended complaint (DN 35) pursuant to 28 U.S.C. § 1915A, the Court allowed Plaintiff's Eighth Amendment claim for deliberate indifference to his serious medical needs to proceed against Defendant Smith in her individual capacity based on the allegations summarized below and dismissed all other claims.  (DNs 22 and 44).  The Court will cite to the second amended complaint as the operative complaint herein.

Plaintiff alleged that he was hospitalized due to cellulitis in his legs on October 18, 2021, and again in June 2022.  (DN 35, PageID #: 194).  Plaintiff stated that on July 19, 2023, he was again sent to the hospital due to cellulitis.  (*Id.*).  He maintained, "The hospital has made it clear

that Burke <u>is</u> in danger of loosing his legs do to the cellulitis if 'Elaine Smith and Wellpath'[1] is aloud to keep straight out refusing Burke medical treatment!" (*Id.*). He stated, "Norton Hospital used I.V. to help stop the cellulitis and help to save Burke's legs, only if correctly treated by [LLCC] Medical Department!!" (*Id.*). He alleged that Defendant Smith was "still denying medical treatment that was ordered by Norton Hospital!" (*Id.*). Plaintiff further stated, "As long as 'Elaine Smith' is still aloud to denie any and all medical treatment by Norton Hospital of Louisville as ordered by the hospital, Burke will always be in imminent danger of loosing his legs or even worse[.]" He continued, "Burke could loose his life if the cellulitin in Burkes legs remain to go untreated correctly as ordered by Norton Hospital!" (*Id.*).

Plaintiff also stated that Defendant Smith "knows Burke has cellulitis in his legs! This was treated by Norton Hospital!" (*Id.*, PageID #: 195). He asserted that Defendant Smith "has done nothing to very little to treat Burkes serious medical needs in order to stop the cellulitis in his legs!" (*Id.*). He stated that "this caused Burkes legs to swell to the point to were he was put in the hospital three times on 10-18-21, 6-2022, and July 19, 2023." (*Id.*).

Plaintiff also stated that Defendant Smith "who is not trained or licensed to do any surgeries . . . done surgery on the Plaintiff to remove a cyst on his talebone, at 9:00 P.M. the surgery went wrong and Plaintiff 'Burke' started to bleed real bad!" (*Id.*, PageID #: 194). He continued, "From 9:15 to 2:00 A.M. it took a nurse to stop the bleeding, to when 'Elaine Smith' straight out refused to come in when the nurse called her at home 'three' times! To come in and redo the surgery to stop the bleeding!" (*Id.*). Plaintiff stated that Defendant Smith "knew Burke had a cyst on his talebone, she did surgery to remove it!" (*Id.*, PageID #: 195). He asserted,

---

[1] Plaintiff's claims against Wellpath were dismissed upon initial review of the second amended complaint. (DN 44).

"Elaine Smiths indifference caused Burke to bleed real bad to when the surgery did went wrong! To when she denied to come in to recorrect the surgery she did!" (*Id.*).

Upon initial review, the Court allowed Plaintiff's claim for deliberate indifference to serious medical needs to proceed against Defendant Smith in her individual capacity based on his allegations concerning treatment for cellulitis in his leg and a cyst on his tailbone.

## II.

### A.

In her motion for summary judgment, Defendant Smith points to Plaintiff's medical records documenting the treatment he received at LLCC, which she attaches to the motion. The Court summarizes the records she produces as follows:

A Health Services Encounter record dated October 24, 2021, documents that a registered nurse responded to the Plaintiff's cell after he told an officer his leg felt numb. (DN 94-1, PageID #: 1417). Plaintiff reported that his right lower extremity ("RLE") had been swollen for months and that the pain started the previous day. (*Id.*). The provider reported that there were "[n]o open spots or drainage noted" on the leg. (*Id.*, PageID #: 1419). The on call provider ("OCP"), Dr. Manning, was notified, and medications were provided orally and by injection. (*Id.*, PageID #: 1420). Plaintiff was directed to keep the right leg elevated and to return to the medical clinic the next day to follow up with the medical provider. (*Id.*, PageID #: 1420).

A Health Service Encounter record dated the following day, October 25, 2021, shows that Defendant Smith examined Plaintiff and assessed Plaintiff as having "Cellulitis RLE." (*Id.*, PageID #: 1422-23). Defendant Smith prescribed additional medications, including the antibiotic Bactrim, and added an unna boot[2] to Plaintiff's treatment plan. (*Id.*, PageID #: 1424).

---

[2] "An Unna Boot is a type of compression bandage that is specifically designed to treat and manage venous leg ulcers. It consists of a layer of zinc-impregnated, semi-rigid gauze wrapped around the affected leg, followed by an outer

In a Health Services Encounter record dated October 28, 2021, Plaintiff presented to the medical unit for evaluation and follow up for "RLE EDEMA/cellulitis unna boot change." (*Id.*, PageID #: 1427). Defendant Smith assessed the condition of Plaintiff's leg and charted that his cellulitis was worsening. (*Id.*, PageID #: 1428). Defendant Smith ordered that Plaintiff be transported to Norton Hospital for treatment. (*Id.*, PageID #: 1429).

A Health Services Encounter record dated November 4, 2021, reflects that Defendant Smith examined Plaintiff upon his return from the hospital, which had occurred the previous evening on November 3, 2021. (*Id.*, PageID #: 1434). She noted that Plaintiff stated that his leg was feeling "much better" and he had "no pain RLE." (*Id.*). Plaintiff was given orders for the antibiotics Bactrim and Keflex. (*Id.*, PageID #: 1435).

In Health Service Encounter records, providers documented that Plaintiff's RLE was washed with warm soapy water and an antibiotic ointment was applied to the area on a daily basis from November 4, 2021, to November 22, 2021. (*Id.*, PageID #: 1437-1460). The only exceptions were on November 9, 2021, where the medical note states that Plaintiff "failed to report to medical for wound care to RLE" (*Id.*, PageID #: 1442) and November 20, 2021, for which no medical note was provided.

A Health Services Encounter record dated November 30, 2021, shows that Plaintiff was seen by Defendant Smith for a weekly evaluation of his RLE wound. (*Id.*, PageID #: 1461). She noted that the wound was "much improved. little to no edema no erythema. no pain" (*Id.*, PageID #: 1461) and that the cellulitis was "healing well." (*Id.*, PageID #: 1462).

In a Health Services Encounter record dated December 23, 2021, Plaintiff was seen by a nurse for a dressing change for a wound to his right forearm. (*Id.*, PageID #: 1464). With regard

---

layer of cohesive compression bandage."  https://www.westernvascular.com/posts/what-a-unna-boot/ (last checked March 6, 2026).

to his RLE, it was noted that Plaintiff's ace bandage was wrapped too tightly causing swelling. (*Id.*). The ace bandage was discarded, and Plaintiff was issued TED hose[3] with instructions to wear them during the day. (*Id.*). He was given instruction to report to medical daily for monitoring. (*Id.*).

A Health Services Encounter record dated April 7, 2022, shows that Plaintiff reported to the medical unit complaining of a "cyst on his tailbone x several years" and reporting that it "drains and bleeds intermittently." (*Id.*, PageID #: 1467). A registered nurse assessed the condition and referred him to a provider for further treatment and instructed him to keep the area clean and dry and to not manipulate the area in any fashion. (*Id.*, PageID #: 1470).

A Health Services Encounter record dated April 11, 2022, documents that Defendant Smith examined Plaintiff's cyst and scheduled an excision. (*Id.*, PageID #: 1472, 1474).

In a Health Services Encounter record dated May 5, 2022, Plaintiff was seen by a registered nurse after he fell. (*Id.*, PageID #: 1475-76). Plaintiff reported that his leg had been "getting red and hot intermittently since his treatments ended in October." (*Id.*, PageID #: 1476). An APRN, Tina Lyons, assessed Plaintiff and treatment was given to Plaintiff, including an injection of medication and oxygen. (*Id.*). After Plaintiff reported that he was feeling nauseous, Lyons ordered that Plaintiff be sent to Norton Hospital. (*Id.*).

A Health Services Encounter record dated May 9, 2022, documents that Defendant Smith assessed Plaintiff upon his "return from [hospital] admit for cellulitis RLE." (*Id.*, PageID #: 1478). Plaintiff reported that his leg "feels much better, leg les pain." (*Id.*). Plaintiff was prescribed two antibiotics, Bactrim and Keflex. (*Id.*, PageID #: 1480).

---

[3] "Thrombo–Embolus deterrent (TED) stockings are also known as compression stockings or Anti-Embolism Stockings and are specially designed that help reduce risk of developing deep vein thrombosis (DVT) or blood clot in your lower leg after Surgery." https://www.bedfordshirehospitals.nhs.uk/patient-information-leaflets/t-e-d-anti-embolism-stockings/ (last checked March 6, 2026).

A Health Services Encounter record dated May 12, 2022, shows Plaintiff was seen by a registered nurse in sick call on the previous day May 11, 2022. (*Id.*, PageID #: 1481). Plaintiff asked "if his medications/antibiotics have been ordered." (*Id.*). Plaintiff was assessed by the provider who charted, "Inmate is alert and oriented. No s/s of acute distress noted. Inmate has +3 pitting edema to RLE. Inmate denies an increase in erythema and pain. Inmate reports wanting to know if he can have a wheelchair to use." (*Id.*, PageID #: 1482). A notation in the record states that the Bactrim was "Received from Pharmacy." (*Id.*). The provider charted, "Per review of Co-Nurse, Inmate Burke's antibiotics should arrive today (05/11/22)." (*Id.*, PageID #: 1484). The provider noted that Plaintiff was "in agreement with plan of care at this time" and that he was "instructed to report any worsening symptoms or new onset of symptoms to staff immediately." (*Id.*).

In a Health Services Encounter record dated June 3, 2022, Plaintiff reported "to medical for surgery clinic for pilonidal cyst removal." (*Id.*, PageID #: 1485). Defendant Smith charted that Plaintiff gave verbal consent for the "I&D," or incision and drainage procedure, that the area was "prepped with betadine, 1% lidocaine w/o epi for local, using scalpel, I&D performed, packed with nugause and 4x4 cover. tol well. Area was an old fibrous hematoma." (*Id.*, PageID #: 1487). She also noted, "evacuated mod amt of blood" and ordered "weekly wound evals." (*Id.*).

Health Services Encounter records show that Plaintiff presented to the medical unit for a dressing change where his buttock wound was cleaned with wound cleanser, assessed for possible infection, packed with gauze, and covered with dressing on June 4, 5, 6, 8, and 9, 2022. (*Id.*, PageID #: 1488-1502).[4]

---

[4] Several of the Health Services Encounter records during this time period documenting Plaintiff's dressing changes include a note, "Treatment Order discontinued by EMS" but also include the note, "Treatment Performed." *See, e.g., id.* at 1491. The reference to "EMS" could be referring the Defendant Smith. Defendant Smith does not offer an explanation for these notations. However, the records make clear that Plaintiff was seen in the medical unit for a

A Health Services Encounter record dated June 10, 2022, documents that Defendant Smith saw Plaintiff for a weekly wound evaluation. (*Id.*, PageID #: 1503). Defendant Smith charted that the wound was "healing well. no [sign or symptom of] infection, wound bed beefy red, closing well" and that weekly wound evaluations would be continued. (*Id.*, PageID #: 1503, 1505). Another Health Services Encounter from that date, June 10, 2022, shows that Plaintiff was also seen by another nurse practitioner for a dressing change. (*Id.*, PageID #: 1506).

Health Services Encounter records show that Plaintiff was seen in the medical unit for a dressing change where buttock wound was cleaned with wound cleanser, packed with gauze, and covered with dressing on June 11, 12, 13, 14, 15, and 16, 2022. (*Id.*, PageID #: 1513-1530).

A Health Services Encounter record dated June 17, 2022, documents that Defendant Smith saw Plaintiff for a weekly wound evaluation, and she noted that the wound was "healing well. closing slowly, no [sign or symptom of] infection" and that the same wound care would be continued. (*Id.*, PageID #: 1531).

Health Services Encounter records show that Plaintiff presented to the medical unit for a dressing change and that buttock wound was cleaned with wound cleanser, assessed for infection, packed with gauze, and covered with dressing on June 17, 18, 19, 20, 22, 23, 24, 25, 27, 29, and 30, 2022. (*Id.*, PageID #: 1534-1539, 1543-1554, 1558-1572).

A Health Services Encounter record dated July 1, 2022, shows that Defendant Smith saw Plaintiff for a follow up for a wound evaluation. (*Id.*, PageID #: 1573). She noted that there was "increased SS drainage today" and "no change in size" and ordered to continue the same plan of care. (*Id.*). Another Health Services Encounter record dated the same date, July 1, 2022, shows

---

dressing change on a daily or near daily basis, and Plaintiff offers no evidence to refute this. Therefore, the record shows that the treatment could not have been ordered to be discontinued.

that Plaintiff's buttock wound was cleaned with wound cleanser, assessed, packed with gauze, and his dressing changed.  (*Id.*, PageID #: 1582).

Additional Health Services Encounter records show that Plaintiff went to medical for a dressing change where his buttock wound was cleaned with wound cleanser, assessed, packed with gauze, and covered with dressing on July 2 and 3, 2022.  (*Id.*, PageID #: 1585-1590).

A Health Services Encounter record dated July 4, 2022, documents that Plaintiff was seen by a registered nurse who charted, "Old 2x2 soaked with serosanguineous drainage.  Bandage not covering wound at the time of arrival in medical. Old dressing removed. No S/S of infection.  Wound was approximately 0.5 cm deep on 6/20/22.  Wound is now approximately 2 cm in depth."  (*Id.*, PageID #: 1591).  The provider also cleaned the wound, packed it with gauze, and covered it with dressing.  (*Id.*).  She recorded that she would "inform provider of increase in wound size."  (*Id.*).

A Health Services Encounter record dated July 5, 2022, documents that Plaintiff "failed to report to medical for scheduled dressing change."  (*Id.*, PageID #: 1594).

A Health Services Encounter record shows that Plaintiff was seen in the medical unit for a dressing change and that his buttock wound was cleaned with wound cleanser, assessed, packed with gauze, and covered with dressing on July 7, 2022.  (*Id.*, PageID #: 1597).

In a Health Services Encounter record dated July 8, 2022, Defendant Smith recorded that she saw Plaintiff for a weekly wound evaluation.  (*Id.*, PageID #: 1600).  She charted, "wound w/ large amt firm hypertophic tissues- needs I&D again."  (*Id.*).  She also noted, "please schedule for repeat I&D of buttock cyst."  (*Id.*, PageID #: 1602).  Another Health Services Encounter record dated July 8, 2022, shows that Plaintiff's buttock wound was cleaned with wound cleanser, assessed, packed with gauze, and his dressing changed on that date.  (*Id.*, PageID #: 1603).

A Health Services Encounter record dated July 9, 2022, documents "Treatment Refused" for Plaintiff's scheduled dressing change.  (*Id.*, PageID #: 1606).

Health Services Encounter records dated July 10, 11, 12, 13, and 14, 2022, show that Plaintiff's buttock wound was cleaned with wound cleanser, assessed, packed with gauze, and his dressing changed on those dates.  (*Id.*, PageID #: 1609-1623).

In a Health Services Encounter record dated July 15, 2022, at approximately 3:50 p.m. Defendant Smith documents that she treated Plaintiff for a repeat incision and drainage procedure of his buttock cyst at approximately 3:50 p.m.  (*Id.*, PageID #: 1624).  She charted that Plaintiff gave his verbal consent for the procedure and "1 % lidocaine w/ epi for local, 3 cm x 3 cm fibrous tissue cyst like structure removed from right buttocks cleft.  tol well.  bleeding controlled w/ cauterization.  area packed w/ a dry 4x4 and covered w/ tegaderm."  (*Id.*, PageID #: 1626).  She also wrote orders for wound care and weekly wound evaluations.  (*Id.*).

A Health Services Encounter record dated July 16, 2022, at approximately 12:03 a.m. documents that Plaintiff presented in the medical unit at for "excessive bleeding."  (*Id.*, PageID #: 1628).  A registered nurse charted the following:

> On 7/15/2022 at approximately 2230, 4A medical received a phone call that an "an inmate was bleeding where he had surgery done today."  IM Burke reported to 4A medical and his khakis were soaked through with bright red blood.  This RN attempted to stop the bleeding but after > 10 minutes of applying pressure, Shane Johnston RN called OCP Elaine Smith APRN who gave orders to apply pressure and apply a cold pack to help stop the bleed and to use silver nitrate sticks.  Shane Johnston RN applied the silver nitrate sticks as ordered and the bleeding stopped.  The right buttock cleft was packed with a 4X4, NS and an ABD pad with tape was applied to the area.
>
> At approximately 2300, IM came back to 4A medical with excessive bleeding.  Shane Johnston RN called OCP and instructions given were to pack the wound and cover wound with as much pressure as possible.  This RN and Shane Johnston RN used 4x4's and an island dressing and tape to the area.

(*Id.*, PageID #: 1629).

A Health Services Encounter record dated July 16, 2022, at approximately 1:00 a.m. shows that Plaintiff returned again to the medical unit for excessive bleeding. (*Id.*, PageID #: 1631). The registered nurse charted the following:

> IM escorted to 4A medical in wheelchair with excessive bleeding. Second dressing held for approximately 55 minutes. Contacted OCP Elaine Smith, APRN who gave orders to pack wound. Wound was cleaned with NS, packed with 4x4 dressing, applied two ABD pads and held together with tape. Will send IM back to yard and have him escorted to 4A medical if excessive bleeding continues.

(*Id.*, PageID #: 1632).

A Health Services Encounter record also dated July 16, 2022, documents that Plaintiff arrived at medical at approximately 11:50 a.m. "for his scheduled dressing change." (*Id.*, PageID #: 1634). The registered nurse documented the following:

> Bulky outer dressing removed as there was no new bleeding since IM was last in medical. Packing intact with no s/s of infection. Will leave in place at this time to prevent further bleeding. Area surrounding the packing cleaned with wound cleanser. Large island dressing placed over wound. IM informed to come back to medical if the bleeding starts again. IM verbalized understanding.

(*Id.*).

A Health Services Encounter record dated the following day, July 17, 2022, shows that Plaintiff presented to medical for a dressing change. (*Id.*, PageID #: 1637). A registered nurse documented that there was "no active bleeding" and no sign or symptom of infection; the dressing was removed and the wound cleaned without bleeding; and the wound was packed and given dressing. (*Id.*). Plaintiff complained of "some pain to site during dressing change," and he was "advised to take Tylenol or Ibuprofen 1 hr prior to dressing change." (*Id.*).

In a Health Services Encounter record dated July 18, 2022, a registered nurse charted that Plaintiff arrived at the medical unit for his scheduled dressing change and that Defendant Smith was present for a wound evaluation. (*Id.*, PageID #: 1640). The provider noted that "silver brown

drainage was noted on old dressing" and that Plaintiff "did have silver nitrate applied to his wound on Friday night due to bleeding." (*Id.*). The wound was cleaned with wound cleanser, and a new dressing was applied. (*Id.*).

A Health Services Encounter record dated July 19, 2022, charts that a registered nurse again saw Plaintiff in the medical unit for a scheduled dressing change. (*Id.*, PageID #: 1643). The provider noted, "Moderate amount of serosanguineous with purulent drainage noted on old dressing." (*Id.*). The wound was cleaned, and a new dressing was applied. (*Id.*). The nurse also charted, "Spoke with provider Elaine Smith APRN about IM's purulent drainage. No wound culture ordered at this time. Will continue to monitor." (*Id.*).

A Health Services Encounter record dated July 20, 2022, shows that Plaintiff presented to medical for a dressing change where his old dressing was removed, his wound cleaned and packed, and a new dressing applied. (*Id.*, PageID #: 1646).

A Health Services Encounter record dated July 22, 2022, documents that Defendant Smith saw Plaintiff for a weekly wound evaluation. (*Id.*, PageID #: 1649). Defendant Smith noted that Plaintiff's wound was healing with no sign or symptom of infection and that the same plan of care would be continued. (*Id.*). Another Health Services Encounter record dated July 22, 2022, shows that Plaintiff came to the medical unit for a dressing change where wound was cleaned and packed and new dressing was applied on that date. (*Id.*, PageID #: 1652).

Health Services Encounter records show that Plaintiff was seen in the medical unit for a dressing change on July 23, 24, 26, 27, 28, 29, 30, and 31, August 1, 3, 4, 9, and 10, 2022. (*Id.*, PageID #: 1655-1660, 1664-1685, 1688-1693, 1697-1702). The record for July 31, 2022, shows that the provider also ordered a culture of the wound based on its appearance on that date. (*Id.*,

PageID #: 1679).  A Health Services Encounter record dated August 2, 2022, documents that Plaintiff "failed to report to medical for scheduled treatment."  (*Id.*, PageID #: 1679).

A Health Services Encounter record dated August 11, 2022, reflects that Defendant Smith saw Plaintiff for a follow up for his wound and culture.  (DN 99-1,[5] PageID #: 2511).  She noted that the "buttock wound healing well, getting smaller.  Approx. 1 cm x 1 cm deep." (*Id.*).  She also charted that Plaintiff had a wound infection and ordered that Plaintiff be given Bactrim, continuation of his wound care, including "weekly would evals until healed. (*Id.*, PageID #: 2513).

Health Services Encounter records show that Plaintiff was seen in the medical unit for dressing changes on August 13, 14, 15, 16, 17, 18, and 19, 2022.  (*Id.*, PageID #: 2515-2538).

Health Services Encounter records show that Plaintiff failed to report to medical for his scheduled dressing changes on August 26, 27, 28, and 30, 2022.  (*Id.*, PageID #: 2539-2550).

A Health Services Encounter dated September 2, 2022, documents that Plaintiff was seen by Defendant Smith for a weekly wound evaluation, and she charted, "wound of left buttocks is healed.  no further wound care needed."  (DN 94-1, PageID #: 1703).

A Health Services Encounter record dated July 15, 2023, shows that an emergency call was received in the medical unit after Plaintiff lost consciousness in his dorm at around 2:30 p.m.  (*Id.*, PageID #: 1706).  A licensed practical nurse charted, "IM denies any illness recently except for feeling very dizzy for the past several days.  HR 119, BP 107/65.  EKG obtained, discovered right leg swollen, red, warm to touch.  Temp 101.5 orally."   A phone call was placed to the OCP (*Id.*) who ordered "IVF 500ml NS[,] Tylenol 1000mg PO BID[,] 1 GM Rocephin now[,] Bactrim DS BID[,] Monitor VS q8h."  (*Id.*, PageID #: 1707).  The provider also noted that she was unable to

---

[5] Records concerning Plaintiff's treatment from August 22 to August 30, 2022, were attached to Defendant Smith's reply, rather than the motion itself.  *See* DN 99-1.

start the IV and made the OCP aware, that she continued to monitor Plaintiff's vital signs while in the medical unit, and that she gave Plaintiff fluids. (*Id.*, PageID #: 1708).

Another Health Services Encounter record dated the same date, July 15, 2023, documents that at approximately 5:15 p.m. Plaintiff was released from the medical unit after his temperature dropped from 102.5 to 99.3 after taking Tylenol and sent back to his cell. (*Id.*, PageID #: 1709-1710).

Another Health Services Encounter record from the same date, July 15, 2023, reflects that approximately 9:20 p.m. Plaintiff returned to the medical unit "feeling dizzy, cold, lightheaded." (*Id.*, PageID #: 1717-1718). APRN Tiny Lyons put in orders to "'start an IV, give a liter of fluid and 1000 mg of Tylenol.'" (*Id.*, PageID #: 1718). A registered nurse charted, "This RN attempted IV x 2, blood return was noted but IV's blew and were unsuccessful. This RN called Tina Lyons, APRN who gave verbal orders to monitor inmate and give another dose of IM Rocephin in the AM. This order will be passed onto day shift nursing staff." (*Id.*). The registered nurse administered 1000 mg of Tylenol and instructed Plaintiff "to come back to the medical unit in six hours for a vitals re-check." (*Id.*).

A Health Services Encounter record dated the next day on July 16, 2023, documents that Plaintiff was seen by Nurse Practitioner Vaughn Ashby at approximately 1:50 pm. (*Id.*, PageID #: 1720). Plaintiff was given doses of Bactrim and Tylenol and told to wait in the medical unit until his temperature came back down. (*Id.*, PageID #: 1721). His temperature dropped from 100.3 to 98.3. (*Id.*). The provider told Plaintiff to return if the problem worsened and to return at 6:00 p.m. for another dosage of his medications. (*Id.*).

In another Health Services Encounter record dated July 16, 2023, a licensed practical nurse saw Plaintiff at approximately 4:50 p.m. in medical for increased swelling in his right foot. (*Id.*,

PageID #: 1722).  The provider noted that Plaintiff's leg was "red, swollen and warm to touch" and that he had a temperature of 101.8.  (*Id.*).  She notified the OCP and received orders to transport Plaintiff to Norton Hospital.  (*Id.*).

A Health Services Encounter record dated July 19, 2023, shows that Plaintiff was seen by a registered nurse on his return from the hospital for treatment for cellulitis.  (*Id.*, PageID #: 1725).  The provider noted, "Reports doing well.  Orders placed by provider.  Wheelchair given to IM until assessed by provider."  (*Id.*).

A Health Services Encounter record dated the following day, July 20, 2023, documents that Plaintiff was seen by Nurse Practitioner Teresa White for "return hosp visit."  (*Id.*, PageID #: 1728).  The provider recommended prescriptions for Keflex and Doxycycline, to keep legs elevated and to wear compressions stockings, and to follow up with medical.  (*Id.*).  She also informed Plaintiff to come to the medical unit for all antibiotic doses.  (*Id.*).  She noted, "All questions/concerns addressed."  (*Id.*).

In support of her motion for summary judgment, Defendant Smith maintains that Plaintiff received adequate medical care for his issues.  (DN 94, PageID #: 1402).  She argues that Plaintiff merely disagrees with the care he received or the timing of the treatment, which does not give rise to the level of a constitutional violation.  (*Id.*).  Defendant Smith states, "Plaintiff cannot point to evidence other than his own nonspecific, unsworn statements demonstrating that his medical treatment was so inadequate that it amounted to no treatment at all."  (*Id.*, PageID #: 1403).  She argues, "Defendant Smith and other practitioners treated the cyst and cellulitis, sent him to outside hospitals when necessary, and ordered many follow-up appointments, some of which Plaintiff refused, to ensure that the issues were healing properly."  (*Id.*).  She asserts that the treatment included weeks of washing Plaintiff's wounds and monitoring them for any adverse reactions and,

when there were adverse reactions, medical personnel ordered that Plaintiff be sent to outside hospitals.  (*Id.*).

Moreover, with regard to the treatment for the cyst on Plaintiff's tailbone, Defendant Smith argues that she "chose to perform an incision and drainage procedure and undertook and oversaw many follow-up appointments, some of which Plaintiff refused, to ensure that the wound healed properly[,]" including "weeks of changing bandages as well as observing for any adverse reactions to treatment."  (*Id.*).  She states that she chose to perform a second incision and drainage procedure and that Plaintiff points to no evidence that the procedure was inappropriate.  (*Id.*, PageID #: 1403-1404).  She maintains, "While Plaintiff did have additional bleeding after the second incision and drainage procedure, Defendant Smith properly advised the on-site nurses on how to stop the bleeding, which was ultimately successful."  (*Id.*, PageID #: 1404).  Defendant Smith argues that while Plaintiff alleged that a nurse asked Defendant Smith to "re-do" the surgery to stop the bleeding, "there is no evidence to support these statements, nor is there any evidence to suggest that such a measure was necessary or even appropriate."  (*Id.*).  In addition, she maintains that, while Plaintiff argues that Defendant Smith was not qualified to perform the incision and drainage procedure, Plaintiff points to no evidence to support this.  (*Id.*).  She attaches a declaration signed under penalty of perjury stating that she is a licensed nurse practitioner with privileges to perform the incision and drainage procedures she undertook.  (DN 94-5, PageID #: 1909).

In addition, Defendant Smith argues that Plaintiff cannot satisfy the subjective component required for stating a deliberate indifference to serious medical needs claim because there is no proof that Defendant Smith knew that Plaintiff's medical issues required additional care in the prison or at an outside hospital.  (*Id.*, PageID #: 1407).  She states, "Smith routinely treated Plaintiff throughout the time periods at issue and provided adequate medical treatment, including physical

compression remedies, antibiotics, pain medication, wound care, drainage procedures, and instructions for outside hospital transport." (*Id.*).[6]

**B.**

Plaintiff filed a response (DN 97), which was not signed under penalty of perjury. With regard to the treatment he received, he largely mirrors the description of the treatment given by Defendant Smith in her motion. However, he states that he was refused treatment for wound care on November 9 and December 1, 2021. (*Id.*, PageID #: 1925). He also asserts that the medical unit never gave him TED hose that he was prescribed. (*Id.*). He further contends that after he returned from Norton Hospital for treatment for cellulitis in May 2022 his "medications never arrived as told by medical." (*Id.*, PageID #: 1926). Plaintiff states that he was refused wound care treatment on July 5 and 9, 2022. (*Id.*). He also argues that, after Defendant Smith performed the second incision and drainage procedure, he returned to the medical unit and that a nurse asked Defendant Smith to return to LLCC to "re do" the surgery multiple times but that Defendant Smith refused to do so. (*Id.*, PageID #: 1926-1927). He also states, "From July 20, 2022 through September 2, 2022, Plaintiff was <u>offered</u> daily dressing changes, but never seen! On August 27, 28, and the 30th of 2022 Plaintiff again was refused wound care treatment!" (*Id.*, PageID #: 1927). He asserts, "Defendant Smith failed to state that the cyst remains on the tailbone of the Plaintiff due to her mistreatment of the wound." (*Id.*).

---

[6] Defendant Smith also moves for summary judgment regarding allegations Plaintiff made in a motion to amend the complaint concerning medical treatment he was receiving in 2025 which was unrelated to the treatment at issue in this case. The Court denied Plaintiff's motion to amend, *see* DN 104, and those allegations are not before the Court. Therefore, the Court will not address the parties' arguments related to 2025 medical treatment. Defendant Smith also argues that she is entitled to summary judgment on grounds that Plaintiff failed to exhaust his administrative remedies as required under 42 U.S.C. § 1997(e) and that many of his claims are barred by the statute of limitations. (*Id.*, PageID #: 1410-1414). Because the Court will grant the motion for summary judgment on the merits, the Court will not address these arguments.

Plaintiff argues that he received inadequate medical treatment for his medical issues at LLCC and has proven the elements of a deliberate indifference claim. (*Id.*, PageID #: 1931). He also asserts, "Prisons adopt policies that restrict access to medical treatment on a blanket basis, regardless of the individuals need!" (*Id.*). He maintains, "In this case, Plaintiff can point to medical evidence and has shown this court through sworn statements demonstrating that his medical treatment was in fact so inadequate that it amounted to no treatment at all." (*Id.*). He also states, "Plaintiff alleges mere disagreement with the medical decisions that Defendant Smith and other practitioners made!" (*Id.*). He further asserts as follows:

> Defendant Smith and others treated the cyst, until Defendant Smith refuse to come in from home to treat Plaintiff for server bleeding! And as to cellulitis! Even though Defendant Elaine Smith sent Plaintiff to the hospital over four (4) times for cellulitis in Plaintiff's legs that facts still remain through Defendants inadequate medical care the cellulitis still remains the Plaintiff legs and he suffers from server pain on a daily basis!!

(*Id.*).

Plaintiff further states, "Defendant Smith chose to perform an incision and drainage procedure and undertook and oversaw many follow-up appointments, some of which Plaintiff was denied! To ensure that the wound healed properly. These included weeks of changing bandages as well as observing for any adverse reactions to treatment." (*Id.*, PageID #: 1932). He continues as follows:

> Smith also chose a second incision and drainage procedure due to inadequate medical care by Defendant Smith! To the extent that the Plaintiff complains about this procedure due to inadequate medical care against by Defendant Smith! Defendant Smith admits the facts as evidenced herein that Plaintiff did have additional bleeding after the second incision and drainage procedure. Defendant Smith advised the on-site nurses on how to stop the bleeding, which did stop the bleeding. Plaintiff does allege that the on-call nurse called Defendant Smith at home to ask her to come and "re-do" the surgery to stop the bleeding. Defendant Smith straight out refused to come back in and stop the bleeding!

(*Id.*).

In response to Defendant Smith's argument that Plaintiff has not satisfied the subjective component of a deliberate indifference claim, Plaintiff states that he "has provided evidence showing that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did not draw the inference." (*Id.*). He maintains, "Here, there is proof that Defendant Smith knew any of the situations allegedly at issue requiring additional care within the prison system or at an outside hospital!" (*Id.*).

## C.

In her reply (DN 99), Defendant Smith argues that Plaintiff alleges generally that prisons adopt policies that restrict access to medical treatment but that Plaintiff "cites no evidence to show that this prison, [LLCC], adopted or implemented such a policy during the time period at issue or that the medical care at issue in this case suffered due to such a policy." (*Id.*, PageID #: 2501).

With regard to Plaintiff's contention that Defendant Smith did not return to the prison to address his bleeding in July 2022, Defendant Smith argues, "Plaintiff does not submit or point to any evidence to show that this was necessary when other medical staff were on site to consult with Defendant Smith and address the issue. Further, Plaintiff admits that the onsite staff's efforts stopped the bleeding." (*Id.*, PageID #: 2501-2502).

In regard to Plaintiff's arguments that he was refused medical treatment on some dates, Defendant Smith maintains that "the medical record demonstrates that it was Plaintiff who refused the medical treatment offered on those dates, whereas Plaintiff offers no actual evidence to dispute this." (*Id.*, PageID #: 2502). In response to Plaintiff's argument that he did not receive medications in May 2022, Defendant Smith argues that Plaintiff ignores the medical note that shows the medication was fact received. (*Id.*, PageID #: 2502-2503).

Defendant Smith also contends that "the fact that Plaintiff allegedly still suffers from cellulitis despite extensive medical treatment is not evidence of deliberate indifference" and the Plaintiff concedes in his response that "the cellulitis condition was much improved as of November 2024." (*Id.*, PageID #: 2503). She also maintains that Plaintiff does not allege or explain how she knew that the treatment being provided to Plaintiff was inadequate. (*Id.*, PageID #: 2505).

**D.**

In his unsworn sur-reply (DN 103), in regard to his contention in his response that prisons adopt policies that restrict access to medical treatment, Plaintiff states that individuals are eligible for Medicaid benefits while incarcerated. (*Id.*, PageID #: 2579). He states, "<u>However</u>, Medicaid will not pay for <u>any</u> services as the institution is responsible for providing their medical care!! Thus meaning, Wellpath is the sole medical provider that is contracted by the Department of Corrections!!" (*Id.*). Plaintiff cites to "Wellpath's Contract page 15 were it states <u>less</u> to none over Department of Corrections Medical Care." (*Id.*).[7]

With respect to Plaintiff's argument that Defendant Smith did not come back to the prison to treat his bleeding after his second incision and drainage procedure, Plaintiff "admits that onsite nurses stopped the bleeding." (*Id.*, PageID #: 2579). He states that, "while Plaintiff specifically complains that Smith did not come in that night to 're-do' the procedure, Plaintiff has clearly shown that it was necessary for Smith to come in to stop the severe bleeding that she has caused by her messed up surgery gone wrong!!" (*Id.*).

Plaintiff again argues that he was denied treatment on some occasions, including November 9, 2021, July 5, 2022, July 9, 2022, and July 20 – September 2, 2022. (*Id.*). He states that Defendant Smith offers no evidence to show that he refused the treatment and that he was

---

[7] Plaintiff cites to Exhibit F in support of this statement, but the Court was not able to locate a Wellpath contract in the attachments to Plaintiff's sur-reply.

refused medical treatment "due to the prison yard being closed or medical staff refused Plaintiff medical treatment on those dates!" (*Id.*, PageID #: 2580). He states, "Defendant Smith cannot clearly show plaintiff refused any treatment without having to sign a refusal form" and the Defendant Smith has not produced any such forms. (*Id.*). With respect to his assertion that he did not receive medications after he returned from the hospital in May 2022, Plaintiff states, "Plaintiff clearly shows that Medicaid refuses to pay for all medical services!! Defendant Smith discontinued all medications from the hospital! Plaintiff still has cellulitis in his legs due to the refusal of medical treatment by Defendant Smith!" (*Id.*, PageID #: 2581).

## III.

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-movant must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine

dispute[.]" Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56.  "The liberal treatment of *pro se* pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, at *6-7 (6th Cir. May 5, 2010) (citations omitted).  When opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a *pro se* litigant does not alter" its burden of showing a genuine issue for trial.  *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted).  Yet statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment.  *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

## IV.

To establish a § 1983 claim premised on inadequate medical care in violation of the Eighth Amendment, a prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component.  The objective component requires the existence of a sufficiently serious medical need.  *Turner v. City of Taylor*, 412 F.3d 629, 646 (6th Cir. 2005).  To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of

mind," rising above negligence or even gross negligence and being "tantamount to intent to punish." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." *Taylor v. Boot*, 58 F. App'x 125, 126 (6th Cir. 2003) (citing *Farmer*, 511 U.S. at 837-47). Less flagrant conduct, however, may still evince deliberate indifference where there is "a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment." *Terrance*, 286 F.3d at 843 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Such grossly inadequate care is "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Moreover, the standard applied in reviewing the actions of prison doctors and medical staff in this type of case is deferential. *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are "generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). A court typically will not find deliberate indifference when some level of medical care has been offered to the inmate. *Christy v. Robinson*, 216 F. Supp. 2d 398, 413-14 (D.N.J. 2002). Mere disagreement over medical treatment cannot give rise to a constitutional claim of deliberate indifference. *Durham v. Nu'Man*, 97 F.3d 862, 869 (6th Cir. 1996). Thus, a difference in medical judgment between an inmate and prison medical personnel regarding the appropriate diagnosis or treatment is not enough to state a deliberate indifference claim. *Ward v. Smith*, No. 95-6666, 1996 U.S. App. LEXIS 28322, at *2 (6th Cir. Oct. 29, 1996).

"Where the claimant received treatment for his condition, . . . he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

The Court finds that Plaintiff's allegations concerning his conditions of cellulitis and a cyst requiring an incision and drainage procedure meet the objective component of a deliberate indifference claim. Therefore, the Court must determine whether Plaintiff has shown the existence of a genuine issue of material fact with respect to the subjective component of a deliberate indifference claim.

### A. Treatment for cellulitis

In his second amended complaint, Plaintiff maintained that Defendant Smith denied him treatment for cellulitis after his return from Norton Hospital. Defendant Smith produces hundreds of pages of medical records documenting Plaintiff's treatment in the LLCC medical unit leading up to his hospitalizations and upon his return from the hospital. In his unsworn response, Plaintiff offers little to dispute Defendant Smith's description of the treatment he received. However, he states that after his hospitalization which lasted from October 28 through November 2, 2021, he was refused wound care treatment on November 9 and December 1, 2021, and was not given TED hose. Even if the Court accepted these assertions as true,[8] and that Defendant Smith was responsible for the failures, the Court finds that the failure to treat Plaintiff for wound care on two dates and failure to provide him TED hose do not show reckless disregard for Plaintiff's conditions when the records produced by Defendant Smith show that he received wound care on almost a daily basis from November 3 through November 22, 2021. (DN 94-1, Page ID#: 1437-60). He was also evaluated by Defendant Smith on November 30, 2021, where she noted that the wound

---

[8] The parties dispute whether Plaintiff refused treatment or *was* refused treatment on these dates. The Court need not resolve the dispute because it will accept as true Plaintiff's allegations for purposes of ruling on the instant motion.

was "much improved. little to no edema no erythema. no pain" (*Id.*, PageID #: 1461) and that the cellulitis was "healing well." (*Id.*, PageID #: 1462). The Court finds that failure to treat Plaintiff on isolated dates and failure to issue him TED hose amount to no more than negligence, which is not sufficient to state a claim under the Eighth Amendment. *See Taylor v. Well Path Med.*, No. 3:22-CV-00705, 2024 U.S. Dist. LEXIS 149569, at *18 (M.D. Tenn. Aug. 20, 2024) (inmate's "desire for different, more aggressive, or more prompt treatment is simply not sufficient to support a constitutional claim"), *report and recommendation adopted*, No. 3:22-CV-00705, 2024 U.S. Dist. LEXIS 185369 (M.D. Tenn. Oct. 10, 2024); *Gabehart v. Chapleau*, No. 96-5050, 1997 U.S. App. LEXIS 6617, at *5 (6th Cir. Apr. 4, 1997) (finding "[m]isdiagnoses, negligence, and malpractice" are not "tantamount to deliberate indifference").

Plaintiff also states in his unsworn response that after he returned from his hospitalization in May 2022, his medications never arrived. However, Plaintiff produces no evidence to support this. In his response, he cites to "[Id. at 279-82]." However, this cite is to the Bates stamp numbers used by Defendant Smith in her attachments to the motion which designated the Health Services Encounter record dated May 12, 2022, in which Plaintiff asked "if his medications/antibiotics have been ordered." (DN 94-1, PageID #: 1481).[9] A notation in that record states that Bactrim was "Received from Pharmacy." (*Id.*, PageID #: 1482). The provider charted, "Per review of Co-Nurse, Inmate Burke's antibiotics should arrive today (05/11/22)." (*Id.*, PageID #: 1484). The provider noted that Plaintiff was "in agreement with plan of care at this time" and that he was "instructed to report any worsening symptoms or new onset of symptoms to staff immediately." (*Id.*). Plaintiff produces no evidence to show that the medications were in fact not received. To

---

[9] Plaintiff also maintains in his sur-reply that these medications never arrived. However, he again cites to no medical record to support this but cites to "[1926]" which is the CM/ECF page identification number of the page where he made this same argument in his response.

the extent Plaintiff cites generally to the entirety of his medical records, which consist of hundreds of pages produced by both parties, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).[10] Plaintiff has failed to show through any evidence of record that he did not receive these medications.

Plaintiff also asserts in his unsworn response that he still has cellulitis in his leg, which he states is evidence of Defendant Smith's deliberate indifference. However, he cites no medical records to show that he still suffers from cellulitis or that, if he does, it was caused by any action or inaction by Defendant Smith. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."); *see also Jones v. City of Franklin*, 677 F. App'x 279, 282 (6th Cir. 2017) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment.") (citation omitted); *Perry v. Agric. Dep't*, No. 6:14-168-DCR, 2016 U.S. Dist. LEXIS 25375, at *34 (E.D. Ky. Feb. 29, 2016) ("[C]onclusory allegations are not evidence and are not adequate to oppose a motion for summary judgment.").

For these reasons, the Court finds that Plaintiff has failed to put forth evidence that Defendant Smith met the subjective component of a deliberate indifference claim with regard to

---

[10] In the complaint, Plaintiff also stated that he was hospitalized for cellulitis on July 19, 2023. The medical records produced by Defendant Smith, as summarized above, do not give any indication that Defendant Smith was involved in his care leading up to or after the July 2023 hospitalization.

Plaintiff's alleged treatment for cellulitis. Therefore, Defendant Smith is entitled to summary judgment on this claim.

### B. Treatment for cyst

In the second amended complaint, Plaintiff also alleged that Defendant Smith performed a surgery to remove a cyst from his tailbone, which she was not trained or license to do. Defendant Smith produces a declaration signed under penalty of perjury stating that she is a licensed nurse practitioner with privileges to perform the incision and drainage procedures she undertook. (DN 94-5, PageID #:1909). Plaintiff offers no evidence to refute this, and Plaintiff therefore fails to establish a genuine issue of material fact as to whether Defendant Smith was licensed to perform the procedure on his tailbone cyst.

Plaintiff also maintains that after the surgery a nurse called Defendant Smith to come back in to "re do" the surgery to stop him from bleeding and that Defendant Smith refused to do so. In his unsworn response to the motion for summary judgment, he also states that he was refused wound care treatment on July 5 and 9, 2022; that from July 20 through September 2, 2022, he was offered daily dressing changes but was never seen; and that on August 27, 28, and 30, 2022, he was refused wound care treatment.

The medical records documenting Plaintiff's treatment in the medical unit for the cyst on his tailbone show that Defendant Smith performed an incision and drainage procedure on the cyst on June 3, 2022, (DN 94-1, PageID #: 1485) and again on July 15, 2022. (*Id.*, PageID #: 1624). Between the two procedures, the medical records show that Plaintiff was seen in the medical unit for a dressing change of his buttock wound on a near daily basis and for weekly wound evaluations from June 4, 2022, to July 14, 2022. (*Id.*, PageID #: 1488-1502, 1506, 1513-1531, 1534-1539, 1543-1554, 1558-1572, 1573, 1582, 1585-1591, 1597, 1600, 1603, and 1609-1623). The Court

accepts as true Plaintiff's allegation that he was refused treatment on July 5, and July 9, 2022. However, the Court finds that this falls short of showing a reckless disregard for his medical condition since he received nearly daily wound care during this period.

As to Plaintiff's claim regarding treatment for bleeding, the medical records produced by Defendant Smith also show that, after Plaintiff's second incision and drainage procedure on July 15, 2022, he returned to the medical unit two times later that day and again at 1:00 am in the early morning of the day after. (*Id.*, PageID #: 1629, 1632). The records indicate that the registered nurse who saw Plaintiff contacted Defendant Smith three times and that Defendant Smith gave orders on methods to stop the bleeding. (*Id.*). The medical records show that the bleeding was fully stopped after Plaintiff's third trip to the medical unit. (*Id.*, PageID #: 1634). None of the medical records produced state that a nurse asked Defendant Smith to re do the surgery or suggest that this was necessary for nurses to stop Plaintiff's bleeding. It is clear that Plaintiff was not denied medical treatment for the bleeding. While Plaintiff disagrees with Defendant Smith's decision not to return to LLCC to treat the bleeding, the Court will not second guess her medical judgment. The Court finds that the treatment Plaintiff received does not amount to a violation of the Eighth Amendment, which is "medical treatment 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness'" *Terrance*, 286 F.3d at 844 (quoting *Waldrop*, 871 F.2d at 1033); *see also Taylor*, 2024 U.S. Dist. LEXIS 149569, at *18 ("In the end, Plaintiff's claim . . . is based upon Plaintiff's dissatisfaction with the adequacy of the treatment that he received, which is insufficient to support a constitutional claim.").

Moreover, as to Plaintiff's contention in his unverified response that he was offered but not given wound care treatment from July 20 through September 2, 2022, this is contradicted by the medical records produced by Defendant Smith. *See Scott v. Harris*, 550 U.S. 372, 380 (2007)

("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  The records show that Plaintiff was treated for dressing change and/or a weekly wound evaluation on a near daily basis from July 20 through August 4 (*Id.*, PageID #: 1646-1652, 1655-1660, 1664-1685, and 1688-1693) and that the provider ordered a culture of the wound after she examined it on July 31, 2022.  (*Id.*, PageID #: 1679).  He was also seen for a dressing change and/or wound evaluation on a near daily basis from August 9 through 19, 2022.  (*Id.*, PageID #: 1697-1702; DN 99-1, PageID #: 2511 and 2515-2538).

As to Plaintiff's contention in his response that he was refused treatment on August 27, 28, and 30, 2022, the Court will accept as true Plaintiff's assertions that he was refused treatment on those dates.[11]  However, the medical records show that on September 2, 2022, Defendant Smith saw Plaintiff for a weekly wound evaluation, and she charted, "wound of left buttocks is healed. no further wound care needed."  (DN 94-1, PageID #: 1703).  Therefore, even if providers refused Plaintiff treatment on August 27, 28, and 30, 2022, and Defendant Smith was responsible for these refusals, she evaluated his wound on September 2, 2022, and determined that no further care was needed.  The Court concludes that Plaintiff has failed to establish through record evidence that Defendant Smith provided treatment that was "so woefully inadequate as to amount to no treatment at all."  *Alspaugh*, 643 F.3d at 169.

For these reasons, Plaintiff has failed to establish a genuine issue of material fact to support the subjective component of a deliberate indifference claim with respect to the treatment he

---

[11] Medical records produced by Defendant Smith show that Plaintiff failed to report to the medical unit for scheduled dressing changes on August 26, 27, 28, and 30.  However, again, the Court need not address this discrepancy since the Court will accept Plaintiff's allegations as true for purposes of ruling on the instant motion.

received for his tailbone cyst, and the Court will grant Defendant Smith's motion for summary judgment on this claim, as well.

## V.

For the reasons stated above, **IT IS ORDERED** that the motion for summary judgment (DN 94) is **GRANTED**.

The Court will enter a separate Judgment dismissing this action for the reasons stated herein and denying Plaintiff's pending motion as moot.[12]

Date:   March 9, 2026

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:     Plaintiff, *pro se*
        Counsel of record
4414.010

---

[12] Plaintiff filed a motion (DN 106) arguing that he is entitled to summary judgment because Defendant Smith filed her motion for summary judgment one day after the Court's deadline for filing a dispositive motion set forth in a prior Order (DN 89).  The Court finds that Defendant's Smith one-day delay did not prejudice Plaintiff and that Plaintiff was able to fully brief the motion.  Therefore, the motion will be denied as moot.